GOODMAN *v.* FELCHER.

STATUTE OF FRAUDS—PROMISE TO PAY ANOTHER'S DEBT—HUS-
BAND AND WIFE.

    A wife is not liable upon a parol promise to pay for supplies previously furnished to a boat owned by her husband, upon which she held a mortgage, although she knew, at the time of making such promise, that the claim for such supplies was a lien upon the boat, and although the creditor thereafter took no steps to enforce a lien, where there was no express agreement that the lien should be released, and the creditor did not know of the wife's interest in the boat.

Error to Saginaw; Snow, J. Submitted February 3, 1898. Decided March 15, 1898.

*Assumpsit* by William E. Goodman and John F. Winkler against Rebecca L. Felcher for goods sold and delivered. From a judgment for plaintiffs, defendant brings error. Reversed.

*Trask & Smith,* for appellant.

*Chauncey H. Gage,* for appellees.

MOORE, J. The plaintiffs sued defendant in justice's court, declaring on all the common counts in *assumpsit,* and specially for goods sold and delivered. Plaintiffs

recovered a judgment for $31.26. · The case was appealed
to the circuit court, where, after a jury trial, judgment
was rendered in favor of plaintiffs for the same amount,
with costs. Defendant brings the case here by writ of error.

In August, 1895, the plaintiffs sold to the steamer Peri-
winkle a bill of coal amounting to $28.77. It seems to be
conceded that the owner of the steamer at this time was
Mr. Felcher, the husband of the defendant. The plain-
tiffs' claim that defendant is liable is based upon the testi-
mony of their collector, Mr. Hay, and the testimony of
Mr. Goodman. Mr. Hay testified:

"After the coal was delivered, I went to the house of
Mrs. Felcher for the pay, and saw Mrs. Felcher there.

"*Q.* What statement did she make to you regarding it?

"*A.* The first time I went there she said Mr. Felcher
was not there; he had been away. I think that was the
day, to the best of my knowledge and belief. Then the
next time that I called she said not to be bothering all the
time, she was good for it, and she would see the bill satis-
fied; and I went down and told Mr. Goodman what she
said.

"*Q.* What did you then do in reference to making out
a bill to her?

"*A.* Why, simply called upon her for the money. She
had promised to pay it.

"*Q.* What did she say in regard to it?

"*A.* She said she had not got the money; she was ex-
pecting to get some, but did not get it. And that was
her excuse from time to time. I cannot say how many
times I called to get it; a great many times, I guess.
She acknowledged she would pay it all the time until the
last time, after the house was burned there, and I went
there, and told her, I says, 'Mrs. Felcher, you had better
take and settle this thing up;' and I says: 'You had better
be wise about it. You promised to pay it.' And she says,
'I didn't promise anything of the kind.'

"*Q.* She stated to you what in regard to the claim
being against the Periwinkle or Felcher?

"*A.* She said not to bother Mr. Felcher at all; she
would see it paid.

"*Q.* As I understand you, she promised to pay it sev-
eral different times?

"*A.* Yes, sir.

"(Cross-examination.) *Q.* The first time you went to see her, what did she say to you, and what did you say to her?

"*A.* I asked Mrs. Felcher if Mr. Felcher was in, and she said 'No,' that he wasn't there, and asked me what my business was, and I gave her the bill, and she said Mr. Felcher was away. So I didn't want to say too much that time. That is all that occurred the first time, as near as I can recollect. I did not show her the same bill we have here, but took her a dozen bills. They stated the amount, but can't say any of them gave the items. They were all made out to the steamer Periwinkle. They stated the amount, and she knew about the coal.

"*Q.* The second time you went there, tell us what she said.

"*A.* She said not to come over there bothering all the time; she would see the bill paid herself.

"*Q.* Is that about all she said?

"*A.* That is about all that was necessary.

"*Q.* Can you recollect any other conversation you had with her?

"*A.* No, not that I recollect. I might have passed the time of day, or talked a little the way collectors generally do. I can't say.

"*Q.* You have told us substantially all that was said?

"*A.* Well, all that I can recollect.

"*Q.* That is, not to keep bothering all the time, and she would see it was paid?

"*A.* Yes, that's the idea exactly."

William E. Goodman testified as follows:

"I am one of the plaintiffs, and am acquainted with the defendant. I remember some coal that was delivered to the steamer Periwinkle. I remember when Mr. Hay returned from defendant's and told me with regard to his conversation with her, and her agreement to pay the bill. I afterwards saw Mrs. Felcher.

"*Q.* What did she say to you in regard to coal bill?

"*A.* She came into our office, and wanted me to take some hay. She said she did not want me to take the pay for the coal out of the hay, because she wanted to use that money. She said she would pay the bill.

"*Q.* Upon being informed that Mrs. Felcher would pay the bill, what did you do in reference to putting in a claim against the steamer Periwinkle, so far as you were concerned?

"*A*. We made no claim after that against the boat. We paid no further attention to the boat at. all, expecting that Mrs. Felcher would pay the bill. We took no further action to collect the claim against the steamer Periwinkle after she promised to pay it.

"*Q*. State whether the firm of Goodman & Winkler, after the time Mr. Hay returned, and informed you of the interview he had there with Mrs. Felcher, looked to the steamer Periwinkle for your pay for the coal?

"*A*. No, sir. We never, after this, looked to the steamer Periwinkle for our pay.

"*Q*. Why not? State why you didn't. (Counsel for defendant objected to giving his reason unless such reason was communicated to defendant, but the court overruled the objection, and counsel for defendant duly excepted.)

"*A*. From that time on we looked to Mrs. Felcher. We did not look to the boat any more. We relied on Mrs. Felcher's promise. I cannot recall that Mrs. Felcher ever spoke to me but once about the bill, and that was when she wanted me to buy the hay, in 1896. Mr. Hay is our collector, and is authorized to make arrangements in regard to our bills.

"(Cross-examination.) *Q*. After your collector, Mr. Hay, returned, and said Mrs. Felcher had said not to bother her any more, that she would see that the bill was paid, you mean after that you looked to her?

"*A*. Yes, sir.

"*Q*. And the only other time that you have any personal knowledge of was, you say, at the time she tried to sell you some hay, and said she would pay the bill, but she didn't want it taken out of the hay?

"*A*. Yes, sir. I think George P. Felcher, or Stewart, ordered the coal."

Mrs. Felcher denied that she made any promise to pay the bill, but admitted that she knew that a claim for coal could be enforced as a lien against the boat. It was shown on the trial that, at the time the bill was made, the firm of A. W. Wright & Co. had a first mortgage on the boat, and the defendant had a second mortgage.

The trial judge, among other things, charged the jury as follows:

"If you find from the evidence in this case that the defendant had a mortgage on this boat in question at the time she had the conversation with the plaintiffs or their agent, and that she knew that the claim that the plaintiffs presented at her house for payment, inquiring for her husband, was in the nature of a lien upon the boat upon which she had a mortgage, and that she promised to pay the debt, believing at the time, from her knowledge of the manner in which boats are conducted, and the manner in which liens are obtained for supplies furnished boats, —knowing at the time, I say, and believing what she did there, that the lien that was upon that boat for the supplies was released, and would be released from that time on, and that she alone would be held for the payment of that debt, then the plaintiffs would be entitled to recover. But, on the other hand, if what she said to the plaintiffs or their agent, at the time she said it, had no reference, in her own mind, to the lien that was created upon this boat, nor no thought of its being discharged upon her promise to pay the debt, then she would not be liable, because it would not be an original promise, as there would be no benefit accruing to her, or that might accrue to her, for the promise to pay the debt. The defendant disputes this. The defense claim that they never at any time promised to pay this debt, neither to the agent nor the plaintiffs; absolutely and emphatically deny it. Now, before you can, in any circumstances in the case, render a verdict against the defendant, you must believe from the preponderance of evidence in the case that the defendant did make that promise under the circumstances which I have explained to you, understanding at the time and believing that the lien was released, and that she alone would be held thereafter for the debt. You must also find that the plaintiffs did release the lien, and that it was released immediately upon her promise to pay the debt; not at some subsequent time, but at the time she made the promise."

This portion of the charge, it is said, is error, for the reason that there is no testimony to base it upon. A careful perusal of the record does not disclose that, at the time of the conversation with Mr. Hay, either he or the plaintiffs knew of the existence of defendant's mortgage. While the record does show that, after Mr. Hay disclosed to the plaintiffs his conversation with defendant, they

looked to her, and not to the boat, for their pay, it does not disclose that, because of her agreement to pay the debt, it was agreed that the lien upon the boat should be relinquished. So far as the record discloses, the plaintiffs were in a position to assert their claim against the owner of the boat or their lien against the boat, and, if they had done so, Mrs. Felcher could not have claimed that they had agreed not to assert it. When the most favorable construction possible for the plaintiffs is put upon the evidence, it amounts, at most, to an agreement upon the part of Mrs. Felcher to pay the debt of another. To make such an agreement valid it must be in writing. 2 How. Stat. § 6185; *Waldo* v. *Simonson,* 18 Mich. 345; *Stewart* v. *Jerome,* 71 Mich. 201 (15 Am. St. Rep. 252), and the cases therein cited. The court should have directed a verdict in favor of defendant.

Judgment is reversed, with costs of both courts.

The other Justices concurred.